UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,
    Plaintiff

v.                                    NO. 3:11-cr-00196 (AWT)

DELLA LIEN,
    Defendant.                MARCH 30, 2012

## SENTENCING MEMORANDUM

This is a perplexing case. It is affected by a cultural divide as wide as it is unfathomable. How can an intelligent, educated woman, once warned by IRS agents about her violations of CTR filing requirements, later repeat those sins and, while doing so, still engage in a $40,000.00 transaction that fully conforms to the requirements? The obvious questions are (1) how does this happen; and, (2), what sanction is "sufficient but not greater than necessary" to fulfill the statutory requirements of 18 USC 3553(a).

The answer to question one is complex and requires an understanding of who Della Lien is, what it is it that she did and what she believed she was doing. Once that is explained, the answer to question two is, we submit, a

monetary fine, a substantial community service obligation and home confinement and supervised release.

### The General Law Applicable to Sentencing

First, the necessaries.

This Court is more than familiar with the law of sentencing and repeatedly receives, in memoranda like this, legal analyses that boil down to the following principles:

(1) the Guidelines are no longer mandatory but advisory;

(2) District Court sentences are reviewed on an abuse of discretion basis for reasonableness;

(3) a guidelines sentence is not presumed to be reasonable; and

(4) in imposing a non-guideline sentence the Court is required to comply with the considerations set forth in 18 U.S.C. 3553(a) and is free to afford whatever weight it believes is appropriate to each of the factors outlined in the statute.

In its en banc decision in United States v. Cavera, 550 F.3d 180 (2d Cir. 2008), the Second Circuit discussed the parameters of federal sentencing law in the wake of United States v. Booker, 543 U.S. 220, 226-27 (2005), which held that mandatory application of the Sentencing Guidelines was

unconstitutional under the Sixth Amendment. The Court in Booker ruled that the Sentencing Guidelines were effectively advisory, and that sentencing courts were permitted to fashion appropriate sentences for each offense taking into consideration not only the Guidelines range, but also the factors enumerated by Congress in 18 U.S.C. §3553(a). Further, such sentences would be reviewed for "unreasonableness." Booker, 543 U.S. at 261. "Review for 'unreasonableness' amounts to review for abuse of discretion." Cavera, 550 F.3d at 187 (citing Gall v. United States, 552 U.S. 38 (2007)).

As the Cavera court recognized:

> A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. In addition to taking into account the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. Id. § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, id. § 3553(a)(3); any pertinent Sentencing Commission policy statement, id. § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, id. § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, id. § 3553(a)(7).

Id. at 187-88.[1]

---

[1] In its entirety, 18 U.S.C. §3553(a) provides:

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

The Sentencing Guidelines provide the "starting point and the initial benchmark" for sentencing, and district courts must "remain cognizant of them throughout the sentencing process." Cavera, 550 F.3d at 189 (citing Gall, 552 U.S. at 49). "It is now, however, emphatically clear that the Guidelines are guidelines - - that is, they are truly advisory." Id. A district court may not presume that a Guidelines sentence is reasonable, but instead must conduct its own independent review of the §3553(a) sentencing factors. Id. Although the district court must consider each §3553(a) factor in choosing a sentence, United States v. Campanelli, 479 F.3d 163, 165 (2d Cir. 2007), the weight to be afforded any single §3553(a) factor is a matter firmly committed to the discretion of the sentencing judge. Id.; United States v. Verkhoglyad, 516 F.3d 122, 131 (2d Cir. 2008).

---

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced. [FN1]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Accordingly, it is well within the sentencing court's discretion to select a sentence below the Guidelines range:

> District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. at 597. **In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.**

Cavera, 550 F.3d at 189 (citing 18 U.S.C. § 3553(a)) (emphasis added). Further, district courts are free to vary from the Guidelines on the basis of a policy disagreement with the Guidelines, even where that policy disagreement applies to a wide class of offenders or offenses. Id. (citing Kimbrough v. United States, 552 U.S. 85 (2007)). Indeed, "[t]he object is always to fashion a sentence 'sufficient, but not greater than necessary' to accomplish the purposes set forth in 18 U.S.C. 3553(a)." United States v. Stewart, 590 F.3d 93, 143 (2d Cir. 2009). The Second Circuit does not presume that a sentence within the Guidelines range is reasonable, nor does it presume that a non-Guidelines sentence is unreasonable. Cavera, 550 F.3d at 190. Moreover, this Circuit does not require extraordinary circumstances to justify a deviation from the Guidelines range. Id.

**Two Observations on the Guideline Calculations**

While the arithmetic of the guideline calculations as computed in the PSR is, unfortunately, correct, applying those guidelines to Della Lien's situation, we submit, calls for a more nuanced approach. The monetary amounts slightly exceed the threshold for two separate enhancements – total amounts (§2B1.1(b)(1)(14)) and amounts within one year (§2S1.3(b)(2)). Applying both enhancements results in an increase of four levels.

PSR Paragraph 21 applies a 14 Level enhancement over the Base Offense of 6 because the monetary amount involved is more than $400,000.00 but less than $1,000,000.00 (§2B1.1(b)(1)(H)). The amount nudges over the $400,000.00 line by only $6,800.00, a little more than 1% of the $600,000.00 spread in the "H" bracket. That $6,800.00 raises the guidelines by two levels over the next lowest level, the $200,000.00 to $400,000.00 bracket. (§2B1.1(b)(1)(G)).

Similarly, PSR Paragraph 22 adds another two levels pursuant to §2S1.3(b)(2) because the amount structured in a twelve month period is more than $100,000.00. The defendant trips the $100,000.00/twelve month bracket by only $8,000.00.

Bright-line standards when applied to human behavior are inevitably flawed.[2] The uniformity such rules appear to provide is illusory and strict application leads to inequities. Is a $400,001.00 problem for one person the same as a $999,999.00 problem for another? An ironclad sentencing template requiring identical application based just on the numbers, just doesn't work. That realization, thankfully, has led us to the present where Guidelines are advisory, not mandatory. So, in this case, we submit, where Ms. Lien just trips the $400,000.00 threshold by a small amount and the $100,000.00/twelve month threshold by a similarly small amount, there should be an adjustment.

**Who Is Della Lien?**

Despite her education and intelligence, Della's culture and upbringing are important sentencing considerations. Della's identity has been uniquely shaped by the political history of China, for she is a child of Chinese political aristocracy. This adds an interesting and challenging layer to the case.

Della's father was a high-level official of the Kuo Ming Tang (KMT), the long-time ruling party of China before Communist takeover in 1949. Founded by Sun Yat-sen, the KMT came to power in the early twentieth century. From

---

[2] The same can (and is) said about mandatory minimum sentences. That, however, is a topic for another day.

approximately 1928 on the KMT – and China – was led by General Chiang Kai-Shek. In 1949, the Communist takeover forced the KMT government to retreat from mainland China to Taiwan. Della's father, who would become Chiang Kai-Shek's Minister of Transportation, retreated with other political leaders to Taiwan. He was followed later by his family when Della was still quite young.

Once established in Taiwan, the KMT ruled the Republic of China (ROC) from Taiwan, refusing to recognize People's Republic of China (PRC) on the Chinese mainland. That fiction continues. Chiang Kai-Shek continued to rule the Republic of China (ROC) to his death in 1975. The PRC, of course, while initially not recognized by many nations, was eventually admitted into the United Nations during the Nixon Administration and currently looms as the giant of world economy.[3]

The KMT would never return to rule the mainland. However, it's single-mindedness in defying political reality and maintaining the fiction has shaped Della's approach to life. Its attitude molded her as a person, formed her perspectives and goes a long way toward explaining who she is, how she thinks, and how she came to do what she did.

---

[3] As a point of interest, Jeremy Lin, a Harvard graduate of recent note, is Taiwanese, though it appears he has been enthusiastically embraced by citizens of both ROC and PRC.

Della was born 70 years ago in her parents' home, on the mainland during the Revolution. While quite young she had a significant skin disease which led others to advise her parents that she should be "thrown away" because of her illness. She was raised in a culture – and a level of that culture – to which most of us cannot relate. As the daughter of a highly placed politician, she was part of the highest levels of the ruling class.

This produced a vast cultural divide and a thought process that is, at times, mystifying. Indeed, should the court choose to question Della about her actions, this will be apparent. Once the KMT was established in Taiwan, Della, as a member of political royalty, was driven to and from school in a big black diplomatic limousine, the type seen in the old black-and-while newsreels, flags flying on the fenders. Her father ruled her home strictly. When he entered the room people were required to stand. He demanded excellence of her.

Della's youth in Taiwan was a life of entitlement on the one hand and deference on the other. She met her father's demands for excellence but, of necessity, developed her own iron will, sense of self-reliance, and independence. That independence fueled her later successes. It also contributed to the acts which bring her before this Court.

Della came alone to the United States to further her education. She first attended Southern Illinois University where she earned a master's degree. She then studied at the University of Pittsburgh toward a PhD in 1973 as a woman in a computer field then dominated by men. She decided she should marry a fellow student and did so. She informed her future husband of her intentions. She made arrangements for the wedding. She directed that it happen. Although the couple lived on meager income as students, both worked toward advanced degrees and then moved to Connecticut. Both became professors and parents of two children, who are now educated and successful adults, and who are contributing and productive members of society.

Della was an educator. Her husband became a professor at Central Connecticut State University (CCSU). Della obtained a position at Quinnipiac, then a college, now a university. Her drive and determination led to a professorship. On her own, over resistance from others, she established and later chaired its International Education Department. At Quinnipiac she not only taught but also fashioned relationships with universities in Asia, as well as organized and directed educational exchanges with a number of countries, including, ironically, the PRC. She did this both as a member of the

Quinnipiac University faculty and also in conjunction with the United Nations supportive programs. Della is now retired.

Along the way, Della devoted time to a number of community activities and organizations. During summer months from 1986 to 1997 she worked with UN related programs. She has also been a deacon in her church and, in that capacity, has aided the elderly parishioners. As well, she has organized a Chinese women's group and has also served on a domestic violence board. A good portion of her time was devoted toward maintaining the Chinese culture among other Chinese in her community.

**What Della Did**

There were substantial amounts of cash secreted in the drop ceiling of the basement of Della's home.[4] Della was aware of the cash transaction reporting procedures – essentially filling out the required forms – but avoided that by making bank deposits of cash in amounts of less than $10,000.00. Those deposits ultimately came to the attention of the Internal Revenue Service. In 2006, IRS agents paid her a cordial visit and advised her that this

---

[4] Law enforcement interviews with a plumber corroborate the existence of cash. There is uncertainty, however, about the source. Della has informed Dr. Zonana that the cash was from her parents and allegedly told the plumber the cash was from her husband's business. There is no claim that the money was acquired illegally.

activity was illegal. She was told this visit constituted a warning. Suffice to say the learning did not have its desired effect.

Della came away with the understanding that the CTR filing requirements were designed for and directed at cash that was obtained illegally, funds derived from criminal activities such as drug dealing, robbery and larceny for example. She made an effort to learn more. She visited two attorneys. The first conceded that he was unfamiliar with the law.[5] This attorney referred her to a second. The visit with Attorney Number Two was not enlightening. It appears that he, although he may have had some knowledge of the CTR laws, was not prepared to give appropriate advice. He told Della that

---

[5] This, surprisingly, is not surprising. Not only does the general public have a complete lack of or misunderstanding of the CTR obligations, many, many attorneys share that ignorance in the same way as did the first attorney whom Della visited. For example, the website of Brach Eichler, LLC, a New Jersey Law Firm, contains the following on its webpage.

> Many clients have vague knowledge of reporting requirements for cash transactions involving $10,000.00. Unfortunately, most clients do not have a full understanding of the potential penalties for attempting to avoid the reporting requirements. Attorneys and clients should take caution to abide by the BSA [Bank Secrecy Act] by operating with currency deposits and withdrawals in the normal course of receiving cash even if doing so results in the filing of a CTR. Remember, the BSA was enacted as a tool to provide information to Government agencies to investigate possible criminal activity and tax evasion. Assuming your clients are not partaking in criminal or tax evading activity, currency reporting should be of no concern to them.

As is apparent from the content, the good people at Brach Eichler recognize the lack of knowledge which many attorneys share with the general public.

she should spend her money and buy diamonds. He did not advise her that CTR violations were felonies and that the penalties for such violations were harsh.

The legal advice Della received reinforced her misunderstanding of the law. Concededly – and mistakenly – she did not comprehend nor appreciate the import of the visit by IRS agents. The legal advice [sic] from two attorneys reinforced her perception. Because the funds were *not* obtained illegally, and were *not* the fruits of criminal activity she mistakenly equated the warning to be similar to a warning for speeding. In her mind – as in the minds of many – she saw the reporting requirements as technicalities and the avoidance of which carried no significant consequences. She was wrong.[6]

Later, in about 2007 through March of 2009, Della made a series of cash deposits of less than $10,000.00. What is striking and mystifying, however, is that in the midst of the post-warning deposits, there was a substantial cash transaction – some $40,000.00 – which was properly documented; that is, the

---

[6] As a sidelight, it is worth noting the contrast when the CTR requirements are juxtaposed against the analogous customs declaration requirements upon entry to the United States. With the latter, falsely completing the forms – i.e., not declaring goods – is an affirmative and illegal act, a false declaration. Depositing less than $10,000.00 in a bank and not filling out a CTR form is not an act but an omission. It is the failure to act that is illegal. There is little wonder why the public perception and understanding of the CTR laws is unclear.

CTR requirements were followed. That fact, together with the mixed-message legal advice she received, corroborates, we submit, Della's assertion that she did not understand the law nor the significance of her actions.

It should be clear: Della accepts full responsibility for what she did. Needless to say, her misunderstanding has been rectified through the tortious experience of this prosecution.

Della made deposits after the IRS visit because she simply did not fully understand the law, nor appreciate its seriousness, nor the penalty for her actions. This misunderstanding and lack of appreciation is, concededly, mystifying. Why, for example, once warned, was the whole cache not deposited at one time? Or in amounts of more than $10,000.00? The court should feel free to question Della about her thought process. Her misplaced confidence in the correctness of her beliefs, much like her defiance of teacher's directive in childhood, does not justify but helps explain her conduct.

Della's perception of the purpose of the law was not entirely incorrect. The CTR requirements have been employed primarily to identify funds of illegal activities, primarily drug dealers. While that perception does not exculpate her, it does, we submit, place her offense out of the heartland. Della's unique

background – both culturally and socially – forged a personality and a thought process that did not, and perhaps could not, properly process the information presented by the IRS. Della's strong will and belief in the legitimacy of the funds, justified, to her, what she did. She nevertheless knowingly failed to follow the law.

## Conclusion

Summing up, then, Della Lien:

- Is a 70 year old educated female with no criminal record.
- She has been active in community affairs in her past.
- She has forfeited $140,000.00 to the United States to date. (More than 1/3 of the entire amount structured).
- None of the funds involved are the product of illegal activity.
- She has a strong-willed personality forged by her upbringing and social status in a foreign culture.

We submit, then, taking all of the above into consideration and the requirements of 18 U.S.C. 3553(a), that the appropriate sentence for Della Lien would involve a combination of the following:

(1)    Fine.

(2) A period of home confinement to be following by a period of supervised release.

(3) A requirement of community service – teaching – together with a financial contribution to the Chinese Language School of Connecticut (a detailed proposal will be filed separately.)

>THE DEFENDANT,
>DELLA LIEN
>
>By /s/ William F. Dow
>    William F. Dow, III (ct00161)
>    JACOBS & DOW, LLC
>    350 Orange Street, P.O. Box 606
>    New Haven, CT 06503
>    Telephone: (203) 772-3100
>    Facsimile: (203) 772-1691
>    E-Mail: wdow@jacobslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2012, a copy of the foregoing was filed electronically and served by United States Mail, first class postage prepaid on any party unable to accept electronic filing. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to any party unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ William F. Dow
William F. Dow, III
